```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF FLORIDA
 2                           MIAMI DIVISION
                      CASE NO.  12-20148-CIV-AOR
 3

 4

 5    RICHARD MAHSHIE,

 6                   Plaintiff,

 7        vs.

 8                                       Miami, Florida
                                         April 12, 2013
 9    INFINITY INSURANCE COMPANY,        Pages 1-57

10                   Defendant.
     _____
11                   TRANSCRIPT OF JURY TRIAL
             BEFORE THE HONORABLE ALICIA OTAZO-REYES
12               UNITED STATES MAGISTRATE JUDGE

13

     APPEARANCES:
14
     FOR THE PLAINTIFF:
15                         Loren & Associates, P.A.
                           BY:  JAMES M. LOREN, ESQ.
16                         320 South State Road Seven
                           Suite 300
17                         Plantation, Florida 33317

18
     FOR THE DEFENDANT:
19                         Jackson Lewis, LLP
                           BY:  TAMMY L. BAKER, ESQ.
20                         BY:  JASON B. SCHATZ, ESQ.
                           One Biscayne Tower
21                         Suite 3500
                           Miami, Florida 33131
22

23   REPORTED BY:          DAWN M. WHITMARSH, RPR
                           Official Court Reporter
24                         400 N. Miami Avenue, 10S03
                           Miami, Florida  33128
25                         Telephone:  305-523-5598
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

```
 1                          P-R-O-C-E-E-D-I-N-G-S
 2              THE COURT:  Thank you.   Please be seated.
 3              We're going to take care of a couple of minor things
 4    first.  Okay.  The one thing that was on my agenda is after we
 5    went off the record, pursuant to my instructions, Defense
 6    counsel submitted a proposed instruction relating to the issue
 7    of speculativeness, and Plaintiff requested that only a portion
 8    of the request from Defendants be given.  I decided to give the
 9    entire request which is simply the damages instruction from the
10    Eleventh Circuit pattern instruction.  So basically I gave what
11    Defendant asked for.
12              So any objection from Plaintiff?
13              MR. LOREN:  No, Your Honor.  We're fine.
14              THE COURT:  Okay.  So we're good on the record there.
15              Now, I do have, after we bring in the jury briefly, to
16    allow Plaintiff to introduce Plaintiff's Exhibit No. 1 and
17    Defendant to introduce Defendant's Number 80 and Plaintiff's
18    Number 135.
19              Do we need to take care of anything else before closing
20    arguments?
21              MR. LOREN:  Your Honor, actually the exhibits are
22    exhibits -- the exhibit number specifically?  I'm sorry.  I
23    missed that.
24              THE COURT:  Plaintiff, you are -- Number 2 is the one
25    you were missing.
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1      MR. LOREN:  Right.  There's a couple of more we found
2  last night.
3      THE COURT:  Okay.  Hang on.  All right.  So you want to
4  introduce Number 2 and what else?
5      MR. LOREN:  641.
6      THE COURT:  641?
7      MR. LOREN:  642.
8      THE COURT:  642.
9      MR. LOREN:  649.
10      THE COURT:  649.
11      MR. LOREN:  650.
12      THE COURT:  650.
13      MR. LOREN:  And 666.
14      THE COURT:  And none of those had been admitted before?
15      MR. LOREN:  I don't believe they have, Your Honor.
16      THE COURT:  Okay.  Let me double-check.  I have 641 was
17  admitted yesterday.  642 was admitted yesterday.  So we don't
18  need to do those again.
19      MR. LOREN:  Okay.
20      THE COURT:  649 was missing.
21      MR. LOREN:  Okay.
22      THE COURT:  650 was admitted.
23      MR. LOREN:  Okay.
24      THE COURT:  And 666 was admitted.
25      MR. LOREN:  Okay.  Perfect.

1          THE COURT:  So you need only introduce 2 and 649.

2          MR. LOREN:  Yes, Your Honor.  Thank you.

3          THE COURT:  Anything else, Defendant?  You're

4     introducing Defendant's 80 and Plaintiff's 135.  Anything else?

5          MR. SCHATZ:  Yes, Your Honor.

6          THE COURT:  That's it?

7          MS. BAKER:  That's it.

8          THE COURT:  We're ready for the jury?

9          MR. LOREN:  We are.

10          THE COURT:  Ready for closings?

11          MR. LOREN:  We are.

12          THE COURT:  All right.  Let's do it.

13          COURT SECURITY OFFICER:  All rise for the jury.

14          (Jury in at 8:26 a.m.)

15          THE COURT:  Thank you very much, ladies and gentlemen,

16     for your promptness.  Please be seated.

17          As I told you before, this morning you will hear the

18     argument, closing arguments of counsel and my instructions on

19     the law.

20          Before we proceed to that, we have a minor housekeeping

21     matter.  There's a couple of exhibits that had not been

22     introduced and had been intended to be introduced and admitted

23     into the record.  So we will reopen the evidence just for the

24     purpose of those exhibits.

25          Mr. Loren?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1      MR. LOREN:  Yes, Your Honor.  Exhibits 2 and 649 we're

2  seeking to admit into evidence.

3      THE COURT:  Any objection?

4      MR. SCHATZ:  No objection.

5      THE COURT:  Plaintiffs Exhibit No. 2 and 649 will be

6  admitted.

7      (Plaintiff's Exhibit 2 & 649 in evidence)

8      THE COURT:  Defendants?

9      MR. SCHATZ:  Defendants would like to offer Defendant's

10 Exhibit 80 and Plaintiff's Exhibit 135 into evidence.

11     MR. LOREN:  No objection.

12     THE COURT:  Very well.  Defendants Exhibit No. 80 and

13 Plaintiffs Exhibit No. 135 will be admitted.

14     (Defendant's 80 in evidence)

15     (Plaintiff's 135 in evidence)

16     THE COURT:  Very well.  Counsel ready to proceed with

17 closing arguments?

18     MR. LOREN:  Yes, Your Honor.

19     THE COURT:  Very well, Mr. Loren.

20     Ladies and gentlemen, kindly pay close attention to the

21 argument of counsel.

22     MR. LOREN:  May it please the court.  Good morning,

23 ladies and gentlemen.

24     Folks, thank you, thank you very much for your

25 undivided attention.  You know, sometimes these cases, this is

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1   not the O.J. Simpson case and some things were extremely,

2   horribly, painfully boring because of the issues raised in this

3   case.  So your indulgence in this matter was much appreciated.

4   Thank you very much.

5          There were certain representations made in this case

6   and if you remember during opening statement of Defendant, they

7   said there is no reason for the Defendant to have known that

8   Plaintiff was working whatever hours he claims to be working.

9   They had no reason to know.

10         Well, do you now see the light.  That's my question.

11  Do you now see the light.  How can you know something if you

12  deliberately don't ask or close your eyes.  You're going to

13  realize that the reason why a lot of things that the Defendant

14  claims not to have known, which they really did know, they

15  didn't want to know, they don't want to admit that they knew

16  because see, if they knew -- and you're going to see the jury

17  instruction in this case -- then there's no liability if they

18  had no knowledge.  So their only escape from the liability in

19  this case is to all in unison say we didn't know, we didn't see

20  after hour e-mails, we didn't see uploads, we didn't see the ICS

21  notes, we didn't see the Sunpass, we didn't see the e-mails

22  where he's saying I'm working off the clock, we didn't see the

23  e-mails where he's saying I'm driving ten to 12 hours a day,

24  they all said we didn't see the e-mails internally regarding our

25  own issues or questions about overtime.  Emma Magnole -- we'll

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1   talk about that in a bit.

2          Now, why would a man of 35 years of experience go ahead

3   and work all these hours unless he absolutely had to do it.

4   Unless this was a requirement of the job and the Defendant knew

5   that this was going on.  How is it possible all this

6   coincidence, but nobody knowing anything.

7          Now see, everything was perfectly, perfectly okay.

8   Everything was perfectly okay provided Mr. Mahshie didn't go

9   ahead and say hey, you know, I'm punching in late hours.  Okay.

10  As long as he didn't punch in a late hour, everything is okay.

11  I don't remember if you remember this, Mr. Casas came in and

12  said well, he didn't have a set schedule.  The reason why he's

13  telling you he didn't have a set schedule is because he wants to

14  say I wouldn't have noticed after hours, weekends and everything

15  else.  Impeachment on his deposition, he went ahead and said 9

16  to 5, 8 to 5, 9 to 6, there was a window.  That's what he said

17  at his deposition.  But at trial he said no, no, he could have

18  worked any time that he wanted to.  That is his position in the

19  case.

20         This November 27, 2011 e-mail is when everything came

21  to a head.  And the moment Mr. Mahshie logged in 9 p.m. -- now,

22  by the way, at this time, there is no evidence that Mr. Mahshie

23  had exceeded the 38.75 hours or 40 hours that week.  The fact

24  that he clocked in the late e-mail, I'm sorry, part-time punch,

25  I have to justify it to John Graziano.  Okay.  Then I asked

1   Mr. Casas, I go Mr. Casas, can you go ahead and tell me

2   specifically, okay, was there a limitation on the amount of

3   overtime I could give.  His response is I can give whatever

4   overtime I want as long as I can justify it.

5         Take a look.  In June 2011, Bill Dibble, one of the top

6   managers of the company, sends John Graziano and all the top

7   managers an e-mail which gets forwarded to the lower managers

8   and says make sure you're watching overtime and approving all

9   over the five hours of pay period which is authorized and

10  controlled by your managers.  So for all the six, seven

11  appraisers, for every two weeks there a maximum of five hours

12  before things broke loose.  Okay.  That's what was happening in

13  this particular case.  So as long as these managers didn't get

14  themselves into hot water and so forth, that was perfectly okay.

15        How did they do it?  They had to get the job done so

16  they put Mr. Mahshie up to working the hours.  He had to work

17  the hours.  There is no possible way for years and years and

18  years Mr. Mahshie is working all these hours without somebody

19  knowing.  You have to be deaf, dumb and blind.  That's what this

20  boils down to.

21        Now let me tell you, Mr. Casas, I'm going to go

22  backwards actually.  Mr. Casas, what a spiteful, nasty

23  individual that guy is.  He is sitting there on the stand all

24  smug and telling you I had no idea, I had no idea, I had no idea

25  under oath before November 20, 2011, I had not an idea that

1   Mr. Mahshie may have been working off the clock.  Oh really?

2   Let's talk about this.  He kept on saying Richard Mahshie kept

3   on disappearing, disappearing and disappearing.  Well, what do

4   you mean he kept on disappearing.  In fact, remember this

5   November 30, 2011, Mr. Mahshie was on vacation and then that

6   e-mail surfaced, the one from July about him not being

7   accessible on voicemail?  Mr. Casas writes in November 30,

8   voicemail full can't get him.  So I asked Mr. Casas, I go

9   Mr. Casas, did he again disappear?  Oh yes, this was normal.  He

10  disappeared all the time.  Then I pull up his vacation record.

11  The guy was on vacation.  He was setting him up.

12          The Defendant made a big to-do about November 20th when

13  he gets fired.  Mr. Mahshie says I didn't work off the clock.

14  You got to look at the context.  It talks about a December 6,

15  2011 punch.  You'll see it in evidence.  I didn't work off the

16  clock when on December 6th or for the duration of my entire 18

17  years, the duration of the last four or five years.  Come on.

18  The same guy who is telling you he wasn't trying to set him up,

19  Mr. Mahshie point blank said look, he was clearly working off

20  the clock.  There's no doubt about it, he didn't dispute it.

21  But he said wasn't I on vacation that day.  Right around that

22  time he was on vacation, he volunteered to come back from

23  vacation to help out.

24          He says, Mr. Casas says, Mr. Mahshie was not a team

25  player.  The e-mail said we're short on people.  Don Farmer and

1   Mahshie are out.  Mahshie says I'll come in and helps you out.

2   Not a team player.  Really?  Spiteful, nasty.

3       You know, they use him, abuse him for 18 years and

4   throw him under the bus.  That's exactly what happened in this

5   particular case.

6       Let's take a look at Mr. Casas.  Okay.  Mr. Casas,

7   amazing.  Mr. Casas says I had no idea he was working late

8   nights off the clock.  There's an e-mail Exhibit 233, November

9   17, 2010.  This was when Mr. Mahshie was an a appraiser,

10  Mr. Casas was a re-inspector.  You see this photograph, it's

11  taken in the dark and there's discussion of Mr. Mahshie saying

12  -- let me just zoom in a little bit -- I don't have a lot of

13  time here so I have to move along quickly, I apologize, by the

14  time it got there it was dark.  This was routine.  Mr. Casas

15  knew.  Okay.  When he became a manager, all of a sudden he's

16  working in the dark, Mr. Casas knew.  Okay.  Bottom line.

17      All right.  Now all these managers:  Shaw, Magnole,

18  Nieves, Veliz, did they know or should have known.  Okay.  Well,

19  you'll see a jury instruction that we'll talk about in a second.

20  Known or should have know.  Well, known is when you see it and

21  you perceive it.  Should have known is when circumstances alert

22  you to a problem and you need to ask what happened.

23      Everybody deliberately claims here that they didn't

24  ask.  Why?  Because they didn't want to know because if they

25  knew, they'd have to pay him overtime.  Real, real simple.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    Okay.

2              Every last witness in the case, again I apologize, you

3    figure it would be easy, ask them a question, get an answer.  We

4    had to pry out the information out of every single witness.  It

5    was like with a crowbar, let's pry out information.  Did you say

6    this in your deposition?  I don't recall this.  Well, what about

7    your deposition.  We'll talk about those.  There's a lot of

8    those.

9              If you notice, Mr. Mahshie, what did they get out of

10   him?  Okay.  You're cheating the company.  Well, he wasn't

11   taking lunches.  We know that because Mr. Veliz said every time

12   I called him for lunch, he was too busy to take lunch and he's

13   clocking in for lunch?  A manager, he knows this.  Okay.

14             Now Mr. Mahshie goes ahead, calls his wife, calls his

15   son, I guess when he's driving, apparently he called the Geek

16   Squad at Best Buy one time during the time.  He went ahead and

17   called a fan company and he uploaded, I guess, an appraisal for

18   a son, guess he was trying to get his son's car fixed.  So after

19   18 years, the best they can do is bring this information.  What

20   does that mean.  We know he loves his wife and his son so he

21   talks to him.  He admitted it, nobody had to pull out the

22   deposition and say did you talk to your wife and son.  He

23   apparently doesn't like a hot house because he called a fan

24   company.  So he apparently doesn't like a broken computer so he

25   called the Geek Squad.  That's the best evidence they have about

1   he's cheating the company.

2          All these people are running around and telling him we

3   couldn't get ahold of him, we couldn't get ahold of him, he's

4   missing.  Mr. Nieves, Mr. Veliz for years, 7 a.m. to 7 p.m.,

5   he's calling him in the morning, at 7 p.m. he's working, no

6   problem getting ahold of him.  But all of a sudden all these

7   witnesses, it's like they all sat in the same room and rehearsed

8   the same thing.  We can't find him until 9:00 or 9:30 or maybe

9   10.  He must have had a late start all this time.  Really?

10  Really?

11         I don't remember if you remember these documents with

12  what's his name, Mr. Casas, you can't clock out before a certain

13  time, you can't clock in after a certain time, you can't clock

14  out after a certain time.  Baloney.  There was a requirement,

15  although there was a little bit of flexibility because these

16  guys are on the road, but it's not like you show up at 10:00 in

17  the morning and say hi, I'm here.  Doesn't make any sense

18  whatsoever.  An unbelievable lack of candor.

19         Now, Pam Jenkins testified.  Ms. Jenkins testified

20  well, you know, you think Infinity was a victim, a victim, we're

21  a victim, he cheated us.  He should have recorded the time.

22  What's interesting Ms. Jenkins said, you know, remember that

23  e-mail with Mr. Casas where Mr. Casas gets this thing that says,

24  you know, from Mr. Mahshie I'm going to be working on my own

25  time on the weekend and so forth?  Ms. Jenkins admitted if

1   Mr. Casas knew this guy was working weekends on his own time off

2   the clock, Mr. Casas should have been fired.  Remember that one?

3   Okay.  Did he inquire, did she inquire about this?  No, she

4   didn't inquire now after the fact.  Did Mr. Casas do anything to

5   follow-up?  He clearly did not.

6        Mr. Mahshie did not comply with the Friday deadline and

7   give him the expense reports and gave it to them on Monday.

8   Mr. Casas should have said hey Mahshie, what is going on here?

9   Deaf, dumb and blind.  Deliberate.

10        When I asked Mr. Casas did you know before November

11   20th that Mr. Mahshie was working on weekends, no I had no idea.

12   Have you seen any of these e-mails?  Nobody seems to see

13   anything.  I mean, you'd think they just, you know, all flew in

14   from Alabama, all came in from the Miami office for the first

15   time, walked into court nobody showed them any documents.

16   Baloney.  Okay.  There is no truth whatsoever to this.

17        Take a look at this.  You know, July 8, 2011, the

18   weekend.  Okay.  Here we go.  November 10th, he punches in at

19   5:15 p.m., into the night and inaccurate records are recorded.

20   Unbelievable.  Doesn't ask, what do you mean you're working into

21   the night?  Okay.  Ignores it.  Again, ignores it.

22        Here we go.  Some more.  Mr. Mahshie, don't clock out

23   early.  I didn't clock out early.  I'm just watching my hours

24   total.  That didn't alert him either.

25        Mr. Casas speaks four different language.  I know

1    language real well.  Really?  What problem did you have

2    understanding that.  Really?  Okay.  This is what's going on in

3    this particular case.

4         Now, let me tell you, I could not have more eloquently

5    summarized this case than did Mr. Mahshie, and quite frankly if

6    I summarize this case probably someone would be very, very angry

7    at me.  But let me show you something.  Okay.  This is what this

8    case is best summarized at.  Before this overtime issue came to

9    a head eight, nine months before his termination, Mr. Mahshie in

10   private writes an e-mail to a friend of his at the company, not

11   management, nothing to do with manager or nothing.  I'll be

12   honest with you, because he got -- he had re-inspection,

13   Mr. Casas was a real treat with the re-inspection and they heard

14   about it how difficult Mr. Casas was.  I'll be honest with you,

15   down here, it's like the tail wagging the dog.  Your experience

16   doesn't mean a thing.  They have very little respect of what you

17   know and your past experience.  They're throwing everything at

18   you and have the balls to tell you not to work overtime.  It's a

19   Catch-22.  They know you have to OT, which is overtime, on your

20   own or get written up.  They've written me up twice and because

21   I've got to rush to make appointments, I received two driving

22   complaints.  He got written up for driving too fast because he's

23   rushing around town zipping around.  If he got one more and I'm

24   out.  So he knew he could get fired if he got one more driving

25   complaint.  Nothing to do with overtime because that was not an

1   issue.  Okay.

2            Best evidence.  Okay.  They claim they had no

3   knowledge, nobody told them nothing.  Really?  Here's another

4   one.  June 14, 2011.  Seven months before termination or eight

5   months, to a manager of all people at Infinity.  Ms. Felton

6   didn't know.  She has her own department.  All the managers know

7   the overtime policies and the whole company knows appraisers are

8   exempt from overtime.  And point blank right there, I've been

9   sitting in the car, Exhibit 488.  Either way I would like to

10  apologize for delay.  It's not easy when you're not in an office

11  setting, rather in a car ten to 12 hours a day.  Most people

12  don't realize how much we drive.  Really, he had no reason to

13  make this up.

14           By the way, these e-mails he had absolutely none of

15  them in his possession.  Guess where we found them?  In the

16  12,000 of pages of documents they produced.  Twelve-thousand.

17  It's like a diary.  It's like finding a secret diary, what

18  somebody is thinking.  Best evidence.  Don't take his word for

19  it, don't take Defendant's word for it, look at the documents

20  that were recorded at or about the time.  It's like you walking

21  through a grocery store and somebody runs over your foot and

22  crushes your toes your first reaction is ouch, okay.  A natural

23  reaction.  Well, there's his natural reaction.  Unprovoked, no

24  motive otherwise.  Okay.  This is what this case is about.

25           All right.  All these dispersions, did you e-mail Pam

1    Jenkins.  You could have e-mailed Pam Jenkins.  You heard from
2    Pam Jenkins, it's like sending the sheep to the wolves.  She
3    knew in February 2009 about this overtime issue, remember that
4    e-mail or whatever it is, we've got a problem here, it's a whole
5    different problem now.  She didn't follow-up, Mr. Shaw didn't
6    follow-up, Emma Magnole didn't follow-up.  Emma Magnole was I
7    don't remember getting this.  Well, how about this.  How about
8    three years later sitting in court do you think someone would
9    show it to her before she got there?  No, I didn't see
10   anything.  Duh.  Really, really insulting.  Insulting.  One lie
11   after another.
12           Let me tell you just briefly, Mr. Veliz, Mr. Veliz his
13   friend, okay.  Well, with friends like this, who needs enemies.
14   Mr. Mahshie helped this guy get promoted.  He worked, he worked
15   7 a.m. to 7 p.m.  Well, what hours did you work?  Routinely
16   regularly worked for January 2009 until September 2010 before
17   Mr. Veliz got promoted, almost two years, from 7 a.m., he called
18   him, he was working.  At 7 p.m. at night, he was still working.
19   Well Mr. Veliz, do you know what Mr. Mahshie was doing in
20   between?  He wasn't boating.  Okay.  He wasn't boating, he
21   clearly wasn't taking lunch.  So draw your own conclusions.
22   What was he doing?  I don't know.  Taking a nap on the side of
23   the road?  Come on.  Really?  Let's get with it.  All right.  I
24   had to stick his deposition and impeach him with his own
25   deposition.

1      How about this?  Mr. Mahshie told you that the

2   management was putting him up to recording false time and not

3   recording the true time.  I don't recall that.  Pull out his

4   deposition, black and white.  Remember that testimony?  I guess

5   I said that.  Should we rely on your testimony a year ago or

6   today's testimony.  I guess we can rely on my deposition.  Well,

7   which one is it?  Come on.  Really?  Did you report him?  No,

8   because he's my friend.  But you apply different rules because

9   he's your friend.  I guess if he wasn't my friend, I probably

10  would report him.  Clearly we know he's not his friend because

11  if he was his friend, he would come in and testify truthfully

12  and repeat what he said in his deposition.  He got nervous in

13  his deposition, he got nervous here.  Couldn't keep his stories

14  straight.  He told the truth the first time around and for this

15  case he came in and lied, bottom line.

16      Okay.  Everybody had memory failures.  I don't

17  remember.  Mr. Casas, oh, I don't remember saying that there was

18  a set schedule.  I pulled out his deposition, you know 9 to 5,

19  you know.  9 to 6?  General window?  Well no, they had

20  flexibility.  Come on, really?  Okay.

21      Mr. Veliz, he knew he had to report overtime violation,

22  didn't report it.  Remember, companies are run through managers

23  and you're going to hear a jury instruction and if you have a

24  manager that doesn't follow the rules, guess what.  The company

25  is responsible for it.  This is not a case about whether the top

1   guy at Infinity knew about overtime violations locally. It's

2   what the local managers knew.  It's not only local managers, we

3   have Ms. Jenkins, she did nothing about it.

4         Okay.  Mr. Shaw.  Mr. Shaw had these incredible

5   revelations.  That's the guy in 2009 that wrote him up in 2009

6   for this.  So they talk about cycle time, but overtime

7   violation, no problem.  Did you follow-up to make sure that he

8   wasn't working overtime whether or not Mr. Mahshie got it or

9   not?  His response is well, yeah.  I kept on reviewing and

10  making sure he wasn't doing it.  I kept on doing the cycle time

11  review.  Well, if he was able to figure out the first time

12  around the cycle time reviews.  Then for the next year, and

13  you're going to look at the records, you're going to see some

14  exhibits that were provided and I'll tell what you those

15  exhibits are in two seconds, but these are summary Exhibits 673

16  and 672, those are CCC records.  Clearly show that this guy was

17  logging in and uploading for a long, long time through the whole

18  time.  Now remember, some of the records that you have a gap on

19  CCC from January to June because they didn't provide his

20  records.  From June 2009 on forward we have them.  So from June

21  2009, it's clear as daylight.  But ICS we have the whole time

22  and it shows after hour logins.

23         Take a look at those Sunpass records.  Take a look.

24  It's offensive.  Like clockwork every day Homestead, 7:00 at

25  night.  8:00 at night.  Take a look, don't take our word for it,

1    Florida records, State of Florida records.

2           Now, let me tell you, these people say we didn't have

3    any reason to know.  He's submitting expense reports,

4    Mr. Mahshie, with these sheets.  Nobody notices anything.  They

5    don't see after hour e-mails 11:00, 9:00, 10:00 e-mails.  They

6    don't see the Sunpass records.  They don't see the things where

7    it says I'm working 10 to 12 hours sitting in a car.  By the

8    way, if he's sitting 10 to 12 hours in a car which is 50 to 60

9    hours which is driving time, how about before work to get things

10   prepped and after work?  Remember that.

11          By the way, just a quick digression.  When you take a

12   look at the law, and I'll show this to you, remember this issue

13   about paying for work at home and time traveling to your first

14   appraisal?  They gave an instruction, Ms. Jenkins, do not pay

15   anybody for that.  Well guess, what that is not the law.  You're

16   going to read the law.  The judge is going to instruct you on

17   the law.  So the moment you start working at home, it's an

18   integral part of the job, it's part of the job responsibility of

19   preparing an appraisal, a later appraisal, the moment you start

20   working at home and you start driving, the clock starts ticking

21   from the time you're driving from the house.

22          And they criticize, say I didn't see a lot of activity,

23   early activity.  Well, they told him not to login early.  Okay.

24   If you finish working and you drive home and you continue

25   working, all that time is compensable.  Pam Jenkins, well, I

1    researched the law.  I have 21 years experience.  I don't know

2    how you're a lawyer or anything, I know what the law is so she

3    decided to instruct everybody to the wrong law.  Remember that.

4              Mr. Shaw has all these recollections.  I remember

5    speaking to him about overtime he admitted.  No, no, I didn't

6    speak to him.  Okay.  After he got impeached with his

7    deposition, everybody all of a sudden had these recollections of

8    things at trial that were not testified to at deposition.  Ms.

9    Jenkins, well, did you look into it?  No.  Did you look at

10   electronic records?  No.   Did you follow-up with it?  No.

11   Really?  Are you serious.  Mr. Shaw didn't follow-up.  Ms.

12   Magnole, did you follow-up?  This is a February 2009, no.  I

13   didn't follow-up.

14             Ms. Magnole, that's a kicker.  See, I didn't get a

15   chance to depose Ms. Magnole.  It was cold turkey.  Ms. Magnole,

16   so did you look at e-mail records?  I don't have access to

17   e-mail records.  Did you change it?  I do have access.  I can

18   get them.  I never looked at e-mail records.  Those e-mail

19   records in July of 2010.  Here we go.  Okay.  Here we go.

20   Exhibit 166.  Take a look at this.  They're digging in his

21   records.  Urgent, let's see if Mr. Mahshie was uploading

22   photographs from somebody else.  Okay.  They dug it up,

23   overtime.  Let's see if you're uploading documents half the

24   time, let me see if you're sending e-mails after time. Did they

25   do it?  Absolutely not.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

```
1        Casas.  Did you pay Mr. Mahshie?  You fired him for
2   working off the clock.  Why not?  Their own rules say pay him.
3   Why not?  Because he denied.  But you know he's working of the
4   clock because they fired him.  Did you pay?  No.
5        How about 2009?  Did anybody inquire, look at the
6   payroll records how much he worked off the clock?  No.  Why not?
7   Because it's not beneficial to them.  It's that simple.
8        Mr. Nieves -- by the way, just to kind of give you --
9   and unfortunately I got to rush, rush, rush because I have very
10  little time to present this, but let me tell you something.  I
11  didn't go ahead and make a big deal out of this.  I just brought
12  it up.  Mr. Nieves during his testimony was asked did you ever
13  record false time or not.  Exhibit 655.  7:20 p.m., February,
14  okay.  Friday, 1:28.  Do you see right here Friday 1:28.
15  Mr. Mahshie tells him I punched out at 5:45 p.m.  You see that?
16  Exhibit 1 B, Bates 344, the punch-out time that Mr. Nieves
17  recorded was 3:41.  Two hour difference.  Oh, I don't record
18  false time at all.  Really?  Everything was rehearsed,
19  everything was amazingly rehearsed.
20        Ladies and gentlemen, this is an absolute outrage.
21  Outrage.  Knew or should have known.  These are the jury
22  instructions that the court is going to provide you.  Let me
23  quickly breeze through this as best as I can.  It says here,
24  this is part of when a corporation is involved, of course it may
25  not act only through people, that is employees and in general, a
```

1   corporation is responsible under law for any acts or statements

2   of its employees which are made within the scope of their duties

3   as employees of the company.   These people were ranking

4   managers.  They weren't just like the janitor, these were

5   managers.  So if a company does something, it does so through

6   its own employees.  Okay.  They did it and they're responsible

7   for it.

8           Now let me show you this, this is instruction for FLSA.

9   The first two elements that we see, an employee, they admit it.

10   They engaged in commerce, that's not an issue.  The first two

11   elements have been satisfied and the court will explain that to

12   you in further instruction.  The third one is the Defendant

13   failed to pay Plaintiff overtime as required by law.  Well, that

14   is clearly an element that we need to satisfy.  We'll talk about

15   it briefly.  It says here FLSA requires employers to pay its

16   employees at least at the rate of one time and a half.  You're

17   going to get Exhibit 674.

18           THE COURT:  Five minutes, Mr. Loren.

19           MR. LOREN:  Thank you, Your Honor.  Exhibit 674 is the

20   breakdowns of the hours worked and the dates and times and

21   holidays, so you have a good idea, you don't have to dig through

22   the records of when he was working.  If you take a look at this

23   -- I'm sorry.  One second here.  So it's time and a half times

24   the regular rate and that rate was 28 something dollars.

25           Now it says here the measure of damages and number of

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    overtime hours above 40 hours.  Our position is he, on average,

2    worked 20 plus hours.  You can find more, you can find less.

3    That's up to you.  You're the finders of the fact.

4           Now, statute of limitations.  If it goes to go back

5    three years.  You have to show that they knew or showed reckless

6    disregard about FLSA.  They clearly now, where they closed their

7    eyes and ignored it.  That's reckless disregard.  So be aware of

8    that.  You can go back three years in this particular case.

9           Now very quickly to go through it, this is very

10   important, under FLSA it says such times -- I'm showing this to

11   you right now, all times spent by employer primarily for the

12   benefit of the employer.  Work at home, driving up to, that is

13   for the benefit of the employer.  It says such time constitutes

14   hours worked if employer knew or should have known that the work

15   assigned was being performed.  Knew or should have known.  Well,

16   you either knew -- Mr. Veliz knew.  Mr. Casas knew.  Everybody

17   knew.  Ms. Jenkins knew because they knew or should have known,

18   they had a duty to inquire.  Should have known, you can't close

19   your eyes and just ignore the facts.  If the house is burning

20   and you smell smoke, if you don't see the flames, you don't just

21   lay in bed and wait to burn the house down.  You get up.

22          There is going to be an instruction given to you about

23   the fact, this is an integral part, before and after and you can

24   read it for yourself, the travel time is compensable.

25          Now, there is an instruction that talks about

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1 inaccurate and missing time records which ties into the previous

2 things, knew or should have known.  What it boils down to is if

3 the records are inaccurate and the Defendant had no knowledge,

4 the Defendant is not responsible.  However, if the Defendant in

5 this particular case encouraged, caused this to occur, knew

6 about it, they can't disclaim liability.  So just because

7 Mr. Mahshie didn't submit accurate time records, he doesn't get

8 prevented from recovery.  You're going to see this through this

9 instruction, so just remember this.  Employees do not -- he

10 doesn't have a burden of sitting there and saying well, I didn't

11 record the right time, I don't get paid.  If they put him up to

12 it, if they caused it, they are responsible for it.  Don't get

13 confused by the instruction or improper argument.

14    Now, let me tell you something real quick.  Defendants

15 failed to pay the Plaintiff overtime wages, this is your verdict

16 form.  Yes or no.  Okay.  The answer is yes.  Was it in reckless

17 disregard?  The answer is yes.  It was reckless.  They knew

18 about it.  Okay.  So it goes back three years.  If you calculate

19 based on calculations, $111,000, this is a pro forma

20 calculation, you're not bound to it.  This is something we came

21 up with.

22    If you take a look, you're going to see a similar type

23 description, but you're not going to get the numbers.  You're

24 going to put your own numbers in, but we provided you the days

25 he was off.  On day he was off, one day we reduced the overtime

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1   to 10 hours.  Weeks he was off, two days, we eliminated overtime

2   and the vacations, holidays.  And after eliminating all this,

3   and taking that into consideration, the number we came up was

4   111,426.79.  The way it works is you take the regular hourly

5   rate times 1.5 times the hours worked and you get the total

6   dollar amount for each of the weeks.  Okay.

7        The jury instructions.  Ladies and gentlemen, my time

8   is pretty much up.  Look.  Bottom line is Mr. Mahshie got stuck

9   in a very unfortunate situation, tail wagging the dog.  If he

10  wanted to keep the job, you kept the hours on the down-low.  If

11  you didn't want to keep the job, the moment he started doing

12  late hours clocking in, they screamed at him.

13       By the way, Mr. Nieves, I don't remember if you

14  remember this, counsel said he was routinely clocking in at 9:00

15  regularly.  So he shows Mr. Nieves' clock-ins, that's Mr. Nieves

16  stopped paying overtime by the way, that Exhibit 1 C.  Okay.

17  Well, guess what.  Then they show Mr. Casas, look Mr. Casas'

18  time, he was logging in.  That's when they yelled at him.  Why

19  are you having these late punch-ins.  This was not the practice.

20       Ladies and gentlemen, I ask that you look at the

21  evidence, use your common sense.  The Defendant clearly knew or

22  should have known about unauthorized overtime and they ever had

23  their own policy, they chose not to pay him.  Why?  Because it

24  was not in their best interest.  Bottom line.

25       We ask that you render a fair and impartial verdict.

1          Thank you very much.

2          THE COURT:  Thank you, Mr. Loren.  Ms. Baker, will you

3    be using the screen?  Let's turn it off so it does not distract.

4          MS. BAKER:  Ladies and gentlemen, on behalf of Infinity

5    and my colleague Jason Schatz, we thank you for your undivided

6    attention.  You have been the most attentive jury and I know

7    it's been a long week for you, so I'm going to try to quickly

8    summarize the evidence and respond to some of what Plaintiff's

9    counsel told you.  As you might guess, we disagree quite a bit.

10         We believe this case boils down to who do you believe.

11   Do you believe Plaintiff or do you believe everybody else.  Is

12   Plaintiff lying or is everybody lying.

13         Let's look at the Plaintiff.  Plaintiff's counsel said

14   you should believe more the documents that were written, that

15   were at the company at the time.  Well, what Plaintiff wrote

16   were his time cards.  What Plaintiff approved were his time

17   cards.  The last document Plaintiff wrote on at the company, i

18   did not work off the clock.

19         And now Plaintiff filed this lawsuit saying oh, wait a

20   minute, I did.  I did work off the clock.

21         Now, he says he was told to write that statement.  The

22   other two people in the meeting, Jimmy Casas, Carlos Torres,

23   they said that wasn't true.  When we confronted him with writing

24   the estimate on his Jeep, you're in company time using company

25   system uploading it, all that stuff, his response was I was just

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    looking for a part.  Toby Lunsford got up, he was like that

2    makes no sense.  We have databases for that.  If you want to

3    find a part, I mean, this guy's been in claims and material

4    damage for 35 years?  And not only does he do an estimate, he

5    does two supplemental estimates to look for a part?

6         Plaintiff has an arbitrary way of deciding whether he

7    got a document, whether he has seen a document.  Do you remember

8    when I asked him several questions did you see this, did you get

9    an employee handbook, his response was well, is my signature on

10   there?  If his signature is not on there, he claims he never saw

11   it.  When he finally did admit that he knew Infinity had a

12   personnel file, I'm sorry, not a personnel file, an employee

13   handbook, then his response became well, I didn't read it.

14        The 2010 discipline.  And I want to be clear, this case

15   is not about his performance.  The only reason performance

16   matters is when it shows his dishonesty and the hours he did or

17   didn't work.  The 2010 discipline that I think he called it

18   malarkey, that he didn't get it or something, I think malarkey

19   was the word if, I remember correctly.  He said it doesn't have

20   my signature on it, never happened.  But that didn't stop his

21   attorney from questioning a lot of witnesses about the e-mails

22   that went into the investigation of it.  So something happened.

23   There were some e-mails about it.

24        And Plaintiff's counsel asked why are they looking into

25   his e-mails for, you know, getting shop photos or getting photos

1    from a job and uploading them as his own, why do they care about

2    that and they don't care about working off the clock?  And the

3    answer is very, very simple.  Because they had reasonable

4    suspicion that that was going on.  They had some reason to

5    believe that these photos may have been sent from the shop and

6    uploaded.  That's why they looked.  They didn't have a reason to

7    believe he was working all these extra hours.  They believed

8    that if he had been working, I believe what Plaintiff's claiming

9    is okay, the weeks that I was there all five days, I worked 20

10   hours of overtime.  And the weeks that I had one day of, you

11   know, paid vacation or holiday or something, I worked 10 hours

12   of overtime.

13           The managers and Toby Lunsford who heads up material

14   damages looked back at all of his stuff and said where?  Where

15   is that 20 hours of overtime?  Where is that 10 hours of

16   overtime?  We don't see it.

17           The only person who testified that Plaintiff was

18   working more hours than he got paid for is Plaintiff.  Everybody

19   else testified to the contrary.  The only person who said a

20   manager ever said or insinuated or pressured him to not write

21   down his time, but to work it anyway, is Plaintiff.  But you saw

22   e-mails again they were written at the time, e-mails, yeah,

23   absolutely believe what the company had.  Those e-mails say just

24   the opposite.  There's an e-mail from Omar saying hey, you know,

25   you worked some on your day off.  Make sure you let me know

1   those hours or put them on your time card, don't forget to do

2   that.  Another e-mail to Jimmy Casas where he's asking about

3   overtime.  Like any company, I mean any company.  They want to

4   know, I mean, somehow when we read those e-mails about overtime,

5   it becomes you may not work any overtime.  That little phrase at

6   the end, unless you have approval, is left off.  Yeah, you have

7   to have approval.  But even when you didn't have approval, you

8   got paid for it.

9          Remember that e-mail that -- between he and Jimmy Casas

10  and you know Jimmy was saying, you know, hey you've got -- it's

11  not much overtime, you've got like an hour and 50 minutes

12  overtime.  You know, I need an explanation so I can explain.  Do

13  we want justification for working overtime?  Absolutely.  I

14  think most companies do.  If we're going to pay overtime, we

15  want to know why and that it was used for a good reason.  And

16  Plaintiff came back and said well, what do you want me to do

17  now?  Just take it off my time card?  And remember, we pulled

18  that time card up?  He didn't take it off.  I mean, if he's

19  really worried about oh, I'm going to get in trouble if there's

20  overtime, why don't you take it off?  But he didn't do it.

21         None of the managers, none of the three, they were all

22  three there, you know, at different times, none of the three

23  said anything about getting in trouble for too much overtime.

24  All they said was we have to know why because I'm the manager, I

25  need to know what's going on with my people.  Makes sense.

1       Plaintiff's work hours, the typical workweek at

2    Infinity was 38.75 hours.  So even before you ever get to

3    overtime, there's an hour and 15 minutes, 1.25 hours of kind of

4    enough time that nobody said anything about.  This case is only

5    about overtime.  And what's so odd about that is that in a

6    number of weeks, I mean, there are dozens of weeks that he

7    didn't even work or didn't report working 38.75.  And nobody

8    told me you can't work 38.75.  It doesn't add up.  There were 47

9    weeks of less than -- excuse me, I've got that backwards, 47

10   weeks he was paid more than 38.75.  54 weeks he was paid less

11   than 38.75 because that's what he reported.  He doesn't have a

12   claim in this case that you didn't pay me what I put on my time

13   card.

14       Now, he says you should have looked at everything.  You

15   should have gone through my e-mails.  You should have gotten my

16   Sunpass.  You should have gone to CCC and ICS and all of those

17   things.  Is he really saying that every manager of every hourly

18   employee, that we can't rely on time cards?  Before we pay an

19   employee, we've got to log on to Sunpass or call them and get

20   the records, we've got to go to Verizon or AT&T and say when can

21   I get these cell phone records because I got to see where he

22   worked, then I got to go through and match up the phone numbers

23   and see where did he call and where was he when he called and

24   all that stuff?  That is a lot of time.  That's a lot of time.

25       And you might recall that Plaintiff admitted I was

1   three months late a lot of times in getting my Sunpass records

2   in.  Okay.  So now it's April and we're going to look at the

3   Sunpass records to see if we paid him correctly for January?

4           He talked about Tammy Felton.  You remember the e-mail,

5   10 to 12 hours.  Tammy Felton is in the department that handles

6   the expense reports.  She gets the expense report.  She doesn't

7   know, she has no access to the guy's time cards.

8           Pam Jenkins, the manager in HR, told you the only

9   people who have access to an employee's time card is that

10   employee and the employee's manager and their direct supervisor.

11   Nobody else.  And so now this person who gets expense reports is

12   supposed to go through those and make sure okay, let me make

13   sure everybody is paid right.  No.  Infinity has a system.  They

14   have a system for employees to accurately report their time.

15   They have an employee handbook specifying that.  They have eTIME

16   guidelines that go out all the time.  I showed you a few of

17   those versions.  They have memo reminders that go out on pay

18   periods the supervisors send out e-mails saying hey, make sure

19   you approve your time card today.  We have employees look at it

20   every two weeks.  We have a policy and if you get a paycheck and

21   it's not right, let us know, we'll fix it.

22           Remember the one we were looking at, eTIME corrections

23   and there was this insinuation that Jimmy or somebody, I don't

24   remember who it was right now, didn't make the correction.  But

25   they did make it.  It was retroactive from a week later.  But

1    yeah, it was there.  They made it when they knew about it.

2    There is no evidence in this case that Infinity hasn't paid

3    every minute of time that they knew about.

4         You talk about e-mails.  Look at the e-mails.  And I do

5    want to mention that.  There are a lot of compilations and

6    summaries of things in this case.  And I think -- well, I know

7    you all can tell the difference between a document that existed

8    at Infinity and a document that the lawyers created.  Both

9    lawyers.  We create documents to make it easy for you to see.

10   Well, why did he have to make the ICS records easy for you to

11   see?  Because he wants to give you the impression that I can

12   look at this and go wow, this is in yellow and all of that is

13   after hours.  Number one, after hours doesn't mean off the clock

14   and we looked at that.  Remember when we were talking about his

15   Jeep, it was on the after hours list, the one that he did for

16   himself, but it was actually on the clock?  He didn't work set

17   hours.  He didn't work 7:30 to 4.  He didn't go to an office

18   where a manager could see if he was there every day.  If he did,

19   and the manager saw him every day, I would be right there with

20   him, he needs to be paid.  But that's not what happened.

21        He testified that Geoff Shaw, he saw zero times while

22   he supervised him.  They corresponded by e-mail, by phone, by

23   fax, never saw each other.  How is Geoff supposed to know what

24   he's doing and when.  He sets the schedule.  He determines what

25   appraisals, he gets the assignments and decides okay, I'm going

1   to do these in this order tomorrow.

2          He chose to live out of the Keys.  That's great.  I

3   don't have a complaint about that.  But then don't expect us to

4   pay for your drive to work.

5          You heard Pam Jenkins.  She said yes, I looked into

6   this.  I looked at some 2010 cases and here's what I decided.

7   What she also said was if he's working at home, he should be

8   clocked in.  So if he wants to work at home for 30 minutes and

9   call and, you know, he talked about being at home for an hour

10  and a half, and I know I'm kind of going here and there, but he

11  talked about being home for an hour and a half in the morning, I

12  get up at 6:30, I think was the testimony, I work for an hour

13  and a half, and then I leave and I work, you know, all day.

14  Look at those Sunpass records.  See if you see that that first

15  toll is before 10:00 on a regular basis.  I challenge you to

16  look at those.

17         The reports that the lawyers created, we did it to try

18  to make it really easy for you.  And think about it.  I mean,

19  you've done pretty much nothing else except listen to us for

20  five days.  You've had this case for five days looking at

21  document after document after document.  Now, compare that to a

22  manager who is doing all their other responsibilities, then it

23  comes time to approve their time card, they've got seven or

24  eight or however many and they're approving their time card,

25  they don't have those nice little charts that have the yellow

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1  column about what's after hours to limit it down.  They don't

2  have any of that.  They don't have a list of e-mails and faxes

3  and what time they were sent and what day they were sent.  They

4  have the real thing.  I mean, they get hundreds of e-mails like

5  everybody does.  And to hold them to this needle in a haystack

6  is a really high standard.

7          And then look at the e-mails.  There are very few to

8  his manager, the one who would have access to his time card.

9  There are very few where they are copied or it's to them and

10  it's off the clock.  I mean, there are some at 8:00 at night but

11  as you saw, he's clocked in sometimes until 10:00 at night.

12  There are some at 7:30 in the morning, again, he was clocked in

13  sometimes at 7:30 in the morning.  Not only look at who they're

14  to and who is copied on them and those sorts of things, but look

15  at what the e-mail is.  Most of them are I forgot to punch in

16  and out, here are my correct times.  And they were times to the

17  minute.  So the manager is supposed to look at that and say

18  okay, you tell me you left at this time and I'm supposed to

19  think you're making that up?  Why would he think that?  They're

20  time corrections, they're forwarding an expense report.  E-mails

21  that they're three, four words in the subject line and that's

22  the whole e-mail.  That are what's called diminimus activities

23  and the judge will explain diminimus to you further.

24          But what the law says is if there are things that you

25  know, they're such a small amount that really is

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    administratively difficult to keep time on, if you're at home

2    and you a thought runs through your mind I forgot to clock out

3    and you're going to send an e-mail to your supervisor, does it

4    make sense to clock in and clock out after you send the e-mail?

5    Those are the kind of things.

6         Plaintiff's counsel and I did agree with one thing he

7    said.  He said if we didn't know, there's no liability.  And

8    that's absolutely true.  He didn't tell you the rest of that.

9         We also believe the judge will instruct you that if the

10   Plaintiff himself deliberately tried to keep from us the hours

11   he worked, then we're not liable.  And how could he say he

12   didn't.  He admitted he lied on his time cards, the estimates in

13   the appraisals.  Let's talk about, I know you probably heard all

14   you ever want to hear about CCC and ICS, but the estimates are

15   CCC.  The manager did not see the estimate until it was

16   complete.  That's when it's uploaded and it has the timestamp

17   and the date stamp.  So what we know from that is it was

18   uploaded at that time and uploading is -- that's what you do.

19   I'm not saying he did or didn't write it when he sent it, I

20   don't know.  His managers don't know.  I mean, that's the point.

21   That's why we have time cards.  Nobody knows.  While it has the

22   date and timestamp, it doesn't show what work was done, it

23   doesn't show when he started or finished it, none of those

24   things do. Sunpass and cell phones and all that stuff, none of

25   it shows that.  It shows what he did at that moment.  Also the

1    manager only knows to look at it again.  It's not a nice list

2    like you all have when the manager gets an ICS notification that

3    this estimate is in there for you to review.  If he doesn't send

4    that, they never review it unless somehow an insured or an owner

5    of a car calls them and says hey, what's going on with my claim.

6         And there were a number of times you might recall that

7    he was written up for documentation.  He wasn't real good about

8    sending those ICS notes.  And there were a whole lot of things

9    his manager didn't see.  Including the Jeep he did for himself.

10   Also he's supposed to do all this by the side of the car.  I

11   mean, the material damage managers, they can't imagine what

12   somebody's doing all those other hours because, you know, shops

13   are only open from this time to this time.  What are you going

14   to do at 10:00 at night when there's not a shop open?  You go

15   out, you write the estimate, you upload it, you get home, you're

16   done.

17        He doesn't work from home.  He works in the field.  He

18   had the home-based agreement because there was no Miami office

19   then.  None at all.  And so Emma Magnole got the same agreement

20   and then that was in 2007, they had temporary space in 2008 and

21   he was no longer a home employee, he's a field employee.

22        He talked about how long it took him in the morning,

23   that hour and a half.  And we've been struggling and scratching

24   our heads going what's he doing for an hour and a half.  He

25   testified that appraisals, if he did the goal number of

1   appraisals is about four per day, so he's setting up four

2   appointments, and then he said 60 to 70 percent of his cars were

3   at body shops.  We don't have to set an appointment, you go to a

4   body shop, they're there, it's not a big deal.  And when he

5   calls a car owner, do they want -- do all the car owners want to

6   talk to him for an hour and a half?  I guess half an hour to be

7   fair, or 20 minutes?  I'm thinking it's more like a couple of

8   minutes.  What time are you coming, here's where I'll be, done.

9          He talked about how long it took to do classic cars.

10   He did six.  Six classic cars in three years.  Six.

11          17 shops within walking distance in Miami.  And I'm not

12   saying everything was there, but you know, chances are he's

13   going to have more than one in that area and he's not going to

14   be driving 45 minutes between looking at cars.

15          The ICS notes.  Again, not the list for them, but every

16   claim number can have up to hundreds or even a thousand claims.

17   I mean ICS notes in one claim written by different -- by an

18   adjuster, by an appraiser, by whoever did whatever on it and

19   there are a little couple of line notes.  During this trial

20   those were read like somebody was going through them, reading

21   ICS notes like it was a novel or something.  It's not what

22   happens.  It's a history so when you're trying to find out what

23   is going on with this claim, you can go back and look at it.

24   But that's the only time you see it.

25          Clearly Plaintiff did not like clocking in.  He made

1   that clear.  And clearly he clocked in when he wanted, he

2   clocked out when he wanted, and he worked when he wanted.

3       Ladies and gentlemen, I so appreciate your service to this

4   court.  I know that you'll review the evidence carefully and

5   make the decision.  And we would ask that you return a verdict

6   for Infinity and against the Plaintiff.  Thank you.

7           THE COURT:  Thank you very much, Ms. Baker.

8           MR. LOREN:  Your Honor, do I have 30 seconds?

9           THE COURT:  No.  You used it all up.

10          MR. LOREN:  Thank you.

11          THE COURT:  Members of the jury, I will now explain to

12  you the rules of law that you must follow and apply in deciding

13  the case.

14          When I have finished, you will go to the jury room and

15  begin your discussions, what we call your deliberations.

16          In deciding the case, you must follow and apply all the

17  law as I explain it to you, whether you agree with the law or

18  not.  And you must not let your decision be influenced in any

19  way by sympathy or by prejudice for or against anyone.

20          The fact that a corporation is involved as a party must

21  not affect your decision in any way.  The corporation and all

22  other persons stand equal before the law, and must be dealt with

23  as equals in a court of justice.

24          When a corporation is involved of course, it may act

25  only through people as its employees.  And in general, a

1   corporation is responsible under the law for any of the acts and

2   statements of its employees which are made within the scope of

3   their duties as employees of the company.

4          In your deliberations, you should consider only the

5   evidence, that is the testimony of the witnesses and the

6   exhibits I have admitted in the record.  But as you consider the

7   evidence both direct and circumstantial, you may make deductions

8   and reach conclusions which reason and common sense lead you to

9   make.

10         Direct evidence is the testimony of one who asserts

11   actual knowledge of a fact such as an eyewitness.

12   Circumstantial evidence is proof of a chain of facts and

13   circumstances tending to prove or disprove any fact in dispute.

14   The law makes no distinction between the weight you may give to

15   either direct or circumstantial evidence.

16         Remember that anything the lawyers say is not evidence

17   in the case.  And except for my instructions to you on the law,

18   you should disregard anything I may have said during the trial

19   in arriving at your decision concerning the facts.  It is your

20   own recollection and interpretation of the evidence that

21   controls.

22         Now, in saying that you must consider all of the

23   evidence, I do not mean that you must accept all of the evidence

24   as true or accurate.  You should decide whether you believe what

25   each witness had to say and how important that testimony was.

1    In making that decision, you may believe or disbelieve any

2    witness in whole or in part.  Also, the number of witnesses

3    testifying concerning any particular dispute is not controlling.

4            In deciding whether you believe or do not believe any

5    witness, I suggest you ask yourself a few questions:

6            Did the witness impress you as one who was telling the

7    truth?

8            Did the witness have any particular reason not to tell

9    the truth?

10           Did the witness have a personal interest in the outcome

11   of the case?

12           Did the witness seem to have a good memory?

13           Did the witness have the opportunity and ability to

14   observe accurately the things he or she testified about?

15           Did the witness appear to understand the questions

16   clearly and answer them directly?

17           Did the witness's testimony differ from other testimony

18   or other evidence?

19           You should also ask yourself whether there was evidence

20   tending to prove that the witness testified falsely concerning

21   some important fact or whether there was evidence that at some

22   other time, the witness said or did something or failed to say

23   or do something which was different from the testimony the

24   witness gave before you during trial.

25           You should keep in mind, of course, that a simple

1   mistake by a witness does not necessarily mean that the witness

2   was not telling the truth as he or she remembers it, because

3   people naturally tend to forget some things or remember other

4   things inaccurately.  So if a witness has made a misstatement,

5   you need to consider whether that misstatement was simply an

6   innocent lapse of memory or an intentional falsehood, and the

7   significance of that may depend on whether it has to do with an

8   important fact or with only an unimportant detail.

9         In this case, it is the responsibility of the Plaintiff

10   to prove every essential part of the Plaintiff's claim by a

11   preponderance of the evidence.  This is sometimes called the

12   burden of proof or the burden of persuasion.  A preponderance of

13   the evidence simply means an amount of evidence that is enough

14   to persuade you that the Plaintiff's claim is more likely true

15   than not true.

16         In deciding whether any fact has been proved by a

17   preponderance of the evidence, you may consider the testimony of

18   all of the witnesses regardless of who may have called them and

19   all of the exhibits received in evidence, regardless of who may

20   have produced them.  If the proof fails to establish any

21   essential part of the Plaintiff's claim by a preponderance of

22   the evidence, you should find for the Defendant on that claim.

23         This case arises under the Fair Labor Standards Act,

24   also known as FLSA, which is the federal law that provides for

25   the payment of time and a half overtime pay.  The Plaintiff

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1   claims that the Defendant did not pay the Plaintiff the overtime

2   pay required by law.  In order to -- I'm sorry.  In order to

3   prevail on this claim, the Plaintiff must prove each of the

4   following facts preponderance of the evidence:

5          First, that the Plaintiff was employed by the Defendant

6   during the time period involved.

7          Second, that the Plaintiff was an employee, employed by

8   an enterprise engaged in commerce or in the production of goods

9   for commerce.

10          And third, that the Defendant failed to pay the

11   Plaintiff the overtime pay required by law.

12          The parties have stipulated or agreed to the first and

13   second facts, namely that the Plaintiff was employed by the

14   Defendant and that the Plaintiff was an employee employed by an

15   enterprise engaged in commerce or the production of goods for

16   commerce.  Therefore, you should consider those facts as

17   established.

18          The third fact which you must determine is whether the

19   Defendant failed to pay the Plaintiff the overtime pay required

20   by law.  In the verdict form that I will explain in a moment,

21   you will be asked to answer a series of questions concerning

22   this fact.  As it relates to the third fact, the FLSA requires

23   an employer to pay its employees at a rate of at least one and a

24   half times the regular rate for time worked in any workweek over

25   40 hours.  This is commonly known as time and a half pay for

1    overtime work.  The employee's regular rate during a particular

2    week is the basis for calculating any overtime pay due to the

3    employee for that week.  If an employee is paid by the hour, the

4    hourly rate is his regular rate.  The overtime rate then would

5    be one and a half times of that rate and would be owing for each

6    hour in excess of 40 hours worked during the workweek.

7           If you find that the Plaintiff has proved the claim,

8    then you must turn to the question of damages which the

9    Plaintiff is entitled to recover.  The measure of damages is the

10   number of overtime hours that the Plaintiff should have been

11   paid under the FLSA, but was not paid, times the overtime rate

12   for each such pay period.  The Plaintiff is entitled to recover

13   lost wages from the present time back to no more than two years

14   before this lawsuit was filed on January 12, 2012, unless you

15   find the employer either knew or showed reckless disregard for

16   the matter of whether its conduct was prohibited by the FLSA.

17   If you find that the employer knew or showed reckless disregard

18   for the matter of whether its conduct was prohibited by the

19   FLSA, the Plaintiff is entitled to recover lost wages from the

20   present time back to no more than three years before this

21   lawsuit was filed.

22          For purposes of the FLSA, work is defined as physical

23   or mental exertion, whether burdensome or not, controlled or

24   required by the employer and pursued necessarily and primarily

25   for the benefit of the employer and his or her business.

1    In determining whether the Plaintiff has proven that he

2   worked hours in excess of 40 in any given week, you are only to

3   consider hours worked.  The phrase "hours worked" includes all

4   time spent by an employee that was primarily for the benefit of

5   the employer or the employer's business.  Such time constitutes

6   hours worked if the employer knew or should have known that the

7   work was being performed.  There is no violation of the FLSA

8   where the employee performs uncompensated work but deliberately

9   prevents his employer from learning of it.  However, when an

10  employer's actions squelch truthful reports of overtime worked

11  or where the employer encourages artificially low reporting, it

12  can not disclaim knowledge.

13    Periods during which an employee is completely released

14  of duty that are long enough to enable the employee to use the

15  time effectively for his own purposes are not hours worked.

16  Activities performed either before or after the regular work

17  shift are compensable if those activities are an integral and

18  indispensable part of the principle activities for which the

19  employees are employed.  Periods of time between the

20  commencement of the employee's first principle activity and the

21  completion of the last principle activity on any workday must be

22  included in the computation of the hours worked.

23    Principle activities include activities that are

24  necessary to the business of the employer and are performed by

25  the employees primarily for the benefit of the employer.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1     Time spent by an employee in travel as part of his

2  principle activity such as travel from job site to job site

3  during the workday must be counted as hours worked.  In other

4  words, if you find that the travel time was integral or

5  indispensable to Plaintiff's work for Defendant, then it is

6  compensable time.  If the travel time is spent predominantly for

7  the benefit of the employer, it is compensable time.  However,

8  if the time is spent predominantly for the benefit of the

9  employee, it is not compensable.

10     The FLSA requires employers to keep records on the

11 earnings and number of hours worked by its employees who are

12 subject to the FLSA.  Where the employer's records of work time

13 are inaccurate or missing, an employee has carried his burden if

14 he proves that he has in fact performed work for which he has

15 been improperly compensated, and if he produces sufficient

16 evidence to show the amount and extent of that work as a matter

17 of just and reasonable inference.  The burden then shifts to the

18 employer to come forward with evidence of the precise amount of

19 work performed or with evidence to negate the reasonableness of

20 the inference to be drawn from the employee's evidence.  If the

21 employer fails to produce such evidence, the employee may then

22 be awarded damages even though the result is only approximate.

23     In regarding working time under the FLSA, insubstantial

24 or insignificant periods of time beyond the scheduled working

25 hours which cannot, as a practical or administrative matter, be

1   precisely recorded for payroll purposes may be disregarded as

2   diminimus.  This rule applies only where there are uncertain and

3   indefinite periods of time involved of a few seconds or minutes

4   duration, and where the failure to count such time is due to

5   considerations justified by industrial realties.  An employer

6   may not arbitrarily fail to count as hours worked any part,

7   however small, of the employee's fixed or regular working time

8   or practically ascertainable period of time he is regularly

9   required to spend on duties assigned to him.

10       In determining whether working time is diminimus, the

11   following considerations are appropriate:

12       One, the practical administrative difficulty of

13   recording the additional time.

14       Two, the aggregate amount of compensable time.

15       And three, the regularity of the additional work.

16       In considering the issue of Plaintiff's damages, you

17   are instructed that you should assess the amount you find to be

18   justified by a preponderance of the evidence as full, just and

19   reasonable compensation for the Plaintiff's damages, no more and

20   no less.  Damages are not allowed as a punishment and cannot be

21   imposed or increased to penalize the Defendant.  Neither can

22   damages be based on speculation or guesswork.  Because only

23   actual damages, what the law calls compensatory damages, can be

24   recovered.

25       If you find for the Plaintiff, you must not take into

1   account any consideration of attorney's fees or court costs in

2   deciding the amount of Plaintiff's damages.  The matter of

3   attorney's fees and court costs will be decided later by the

4   court.

5        Of course, the fact that I have given you instructions

6   concerning the issue of the Plaintiff's damages should not be

7   interpreted in any way as an indication that I believe that the

8   Plaintiff should or should not prevail in this case.

9        Any verdict you reach in the jury room must be

10  unanimous.  In other words, to return a verdict, you must all

11  agree.

12       Your deliberations will be secret.  You will never have

13  to explain your verdict to anyone.

14       It is your duty as jurors to discuss the case with one

15  another in an effort to reach agreement, if you can do so.  Each

16  of you must decide the case for yourself, but only after full

17  consideration of the evidence with the other members of the

18  jury.

19       While you're discussing the case, do not hesitate to

20  reexamine your own opinion and change your mind if you become

21  convinced that you were wrong.  But, do not give up your honest

22  beliefs solely because the others think differently or merely to

23  get the case over with.

24       Remember, that in a very real way you are judges,

25  judges of the facts.  Your only interest is to seek the truth

1    from the evidence in the case.

2          During your deliberations, you must not communicate

3    with or provide any information to anyone by any means about

4    this case.  You may not use any electronic device or media such

5    as the telephone, cell phone, smartphone, iPhone, Blackberry or

6    computer, the internet, any internet service, any text or

7    instant messaging service, any internet chat room, blog or

8    website such as Facebook, My Space, Linked In, You Tube or

9    Twitter to communicate to anyone any information about this case

10   or to conduct any research about this case until I accept your

11   verdict.

12          In other words, you cannot talk to anyone on the phone,

13   correspond with anyone or electronically communicate with anyone

14   about this case.  You can only discuss the case in the jury room

15   with your fellow jurors during deliberations.  I expect you will

16   inform me as soon as you become aware of another juror's

17   violation of these instructions.

18          You may not use these electronic means to investigate

19   or communicate about the case because it is important that you

20   decide the case based solely on the evidence presented in this

21   courtroom.  Information on the internet or available through

22   social media might be wrong, incomplete or inaccurate.  You are

23   only permitted to discuss the case with your fellow jurors

24   during your deliberations because they have seen and heard the

25   same evidence that you have.

1    In our judicial system, it is important that you're not

2    influenced by anything or anyone outside of this courtroom.

3    Otherwise, your decision may be based on information known only

4    by you and not your fellow jurors or the parties in the case.

5    This would unfairly and adversely impact the judicial process.

6    When you go to the jury room, you should first select

7    one of your number to act as your foreperson.  The foreperson

8    will preside over your deliberations and will speak for you here

9    in court.

10    A form of verdict has been prepared for your

11    convenience.  This is the form of verdict, I will read it out to

12    you and you will have it with you in the jury room.  It reads

13    the style of the case, verdict form.  Do you find by a

14    preponderance of the evidence one, that the Defendant failed to

15    pay the Plaintiff the overtime pay required by law.  Answer, and

16    there's a space for you to check either yes or no.  Then you get

17    the instruction that says if you answered no to the preceding

18    question, you need not answer the remaining questions.  Simply

19    sign and date the verdict form.

20    If you answered yes, then you go onto the next two

21    questions which are question number two, that again do you find

22    by a preponderance of the evidence that the employer either knew

23    or showed reckless disregard for whether its conduct was

24    prohibited by the FLSA.  Again, a space for yes or no.  And the

25    third question again, do you find by a preponderance of the

1   evidence that the Plaintiff should be awarded, dollar sign and

2   space, as the Plaintiff's damages and in that space after the

3   dollar sign you would enter what you find to be the Plaintiff's

4   damages.  And then it ends so say we all, and there's a space

5   for the foreperson to sign and date the verdict form.

6           You will take the verdict form to the jury room and

7   when you have reached unanimous agreement, you will have your

8   foreperson fill in the verdict form, date and sign it and then

9   return to the courtroom.

10          If you should desire to communicate with me at any

11  time, you are being furnished some forms also that will go to

12  you where you can write down your message or question and pass

13  the note to the Marshal who will bring it to my attention.  I

14  will then respond as promptly as possible either in writing or

15  by having you return to the courtroom so that I can address you

16  orally.

17          I caution you, however, with regard to any message or

18  question you might send that you should not tell me your

19  numerical division at that time, and also I will add that if you

20  have any question about a particular jury instruction by any

21  chance, you will note that the set of jury instructions that you

22  receive every page has been numbered sequentially.  So if you

23  have a particular question about an instruction, please

24  reference the page number so that we understand exactly what

25  you're asking.

1          Very well.  You will receive the written instructions

2    that I have just read to you, the verdict form, and the question

3    note from the jury to the court form.  All of these things will

4    be provided to you by Ms. Lee.

5          Also all of the documents that have been admitted into

6    evidence will be placed in the courtroom and also in a little

7    while, some time, you will provided menus so that you can select

8    what you would like for lunch and that lunch will be delivered

9    to you to the jury room.

10          Very well?  Thank you very much again, ladies and

11    gentlemen, for your attention.

12          COURT SECURITY OFFICER:  All rise.

13          (Jury out at 9:48 a.m.)

14          THE COURT:  Very well.  We're in recess.  What are your

15    plans?  Are you all going to hang around to the courtroom, are

16    you planning to go back to your offices?  If you are, I would

17    need to have cell phones available in case we have jury

18    questions.

19          MS. BAKER:  Your Honor, we're remaining here for the

20    Defense.

21          THE COURT:  Okay.  Mr. Loren?

22          MR. LOREN:  I'm going to be locally here, but if I go

23    very close by and I'll give my cell phone just in case.

24          THE COURT:  All right.  So please write down your cell

25    numbers and I'm thinking of ordering lunch so they can eat at

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    noontime which has been their usual lunch hour.

2              Okay?  We're in recess.  Thank you very much.

3              MR. LOREN:  Your Honor, exhibits going back?

4              THE COURT:  Stephanie will take care of that.

5              (Brief recess)

6              (Lunch recess).

7              THE COURT:  Bring the jury in.

8              (Jury in at 1:08 p.m.)

9              THE COURT:  Thank you very much, ladies and gentlemen.

10   I am informed that you have a verdict?

11             JUROR:  Yes, we do.

12             THE COURT:   Please have a seat for a moment.  Will the

13   foreman please hand the verdict to my courtroom deputy?

14             Ms. Lee, please publish the verdict and poll the

15   jurors.

16             COURTROOM DEPUTY:  United States District Court,

17   Southern District of Florida, Miami division.  Case number

18   1-12-20148 civil Otazo-Reyes consent case Richard Mahshie,

19   Plaintiff versus Infinity Insurance Company, Defendant.

20             Verdict form:  Do you find from a preponderance of the

21   evidence that the Defendant failed to pay the Plaintiff overtime

22   pay required by law?  Answer, yes.

23             If you answer no to the preceding question, you need

24   not answer the remaining questions.  Simply sign and date the

25   verdict form.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1           Number two.  That the employer either knew or showed
2     reckless disregard for whether its conduct was prohibited by the
3     FLSA.  Answer, yes.
4           Number three, that the Plaintiff should be awarded
5     $111,265 as the Plaintiff's damages.
6           So say we all, foreperson is Mr. Manfred, dated April
7     12, 2013.
8           And poll the jury?  I'm sorry, Judge.
9           Ladies and gentlemen of the jury, I will ask each of
10    you a question.  Please answer yes or no so the court may hear
11    you.  Juror number one, is the verdict as read your verdict?
12          JUROR:  Correct.
13          COURTROOM DEPUTY:  Juror number two?
14          JUROR:  Correct.
15          COURTROOM DEPUTY:  Juror number three?
16          JUROR:  Correct.
17          COURTROOM DEPUTY:  Juror number four?
18          JUROR:  Correct.
19          COURTROOM DEPUTY:  Juror number five?
20          JUROR:  Correct.
21          COURTROOM DEPUTY:  Juror number six?
22          JUROR:  Correct.
23          COURTROOM DEPUTY:  Juror number seven?
24          JUROR:  Correct.
25          COURTROOM DEPUTY:  Juror number eight?

```
 1            JUROR:  Correct.

 2            THE COURT:  Thank you very much, Ms. Lee.

 3            Ladies and gentlemen, thank you so much for your

 4    punctuality, your attendance and your attention to duty.  As a

 5    token of our appreciation, we have certificates that we would

 6    like to give to you to take as a memento of your service with us

 7    in this court.  Ms. Lee?

 8            Thank you very much ladies and gentlemen, again.  Your

 9    service is concluded in this case.  You are free to go and

10    again, I have to say you have been a very, very, how should I

11    say, a proficient and attentive and pleasant jury.  Very good?

12    Thank you.

13            JUROR:  Do we call in for next week?

14            COURTROOM DEPUTY:  They do.

15            THE COURT:  You call in for next week.  All right?

16            COURT SECURITY OFFICER:  All rise.

17            THE COURT:  Thank you very much and God speed.

18            Thank you.  Please be seated.  As you know, the matter

19    of the liquidated damages is for the court and generally the

20    case law provides for where there is a finding of recklessness,

21    the good faith defense does not apply.  Nevertheless, just to

22    make sure that the record is complete, I will request Mr. Loren,

23    however long you require Mr. Loren, either a week or two weeks

24    to file a motion for the liquidated damages.  How much time

25    would you like?
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

```
1          MR. LOREN:  I'll have it in five days, Your Honor.

2          THE COURT:  In five days?

3          MR. LOREN:  Or less.

4          THE COURT:  All right.  So let's say by next Friday.

5          MR. LOREN:  Yes, ma'am.

6          THE COURT:  And response from the Defendants?  From the

7  Defendant?  I'm sorry?  Defendant's counsel.

8          MR. SCHATZ:  If we could have five business days after

9  that to respond.

10         THE COURT:  All right.  So the motion next Friday and

11 the response the Friday after.  I don't think I will need a

12 reply for that and then upon receipt of that, I will enter the

13 judgment.  Very well?

14         MR. LOREN:  Yes, Your Honor.

15         THE COURT:  Thank you very much.  I have to say

16 everybody was on time, which is really a help for the court so I

17 thank the jurors and I'm thanking all of you and any other

18 matters that you need to bring before the court's attention such

19 as attorney's fees, that is covered by the rules so I don't need

20 to instruct you on that.  And I wish you all the best of luck

21 and congratulate you and each of your clients.  There always has

22 to be a winner and a loser of course, but I think both

23 Mr. Mahshie and Infinity can be assured that they were very

24 zealously represented in this trial.  Very well?

25         MR. LOREN:  Thank you, Your Honor.
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1     THE COURT:  Thank you very much.

2     MR. SCHATZ:  Your Honor, if we wish to renew our

3 motion, Rule 50 motion?

4     THE COURT:  Okay.

5     MR. SCHATZ:  At this time.  What we submitted in

6 writing or orally?

7     THE COURT:  Follow the rule on that.

8     MR. SCHATZ:  Right.

9     THE COURT:  All right?  Thank you very much.

10    MR. LOREN:  Thank you.

11    MS. BAKER:  Thank you.

12    COURTROOM DEPUTY:  Court's adjourned.

13     (PROCEEDINGS CONCLUDED)

         * * * * *

14

        **C E R T I F I C A T E**

15 I certify that the foregoing is a correct transcript from the
 record of proceedings in the above-entitled matter.

16

 _____  /s/ Dawn M. Whitmarsh

17 Date     DAWN M. WHITMARSH, RPR

18

        **I N D E X**

19

       **WITNESSES**

20

 None

21

22       **EXHIBITS**

23 NO.:  DESCRIPTION:      PAGE:

24 For Plaintiff's:

25 2 & 649 :
    In Evidence      5:7

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

```
 1
     135          :
 2                   In Evidence                                    5:15

 3   For Defendant's:

 4   80           :
                    In Evidence                                     5:14
 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**